Case number 24-11 of Line et al. Michael Solondz, Petitioner v. Federal Aviation Administration. Mr. Nagy for the Petitioner, Mr. Carver for the Respondent. Mr. Nagy, you may proceed when you're ready. Thank you, Your Honors. I believe I have two minutes for rebuttal. Is that still permissible to reserve? All right, thank you. May it please the Court. I'm Brandon Nagy on behalf of the Petitioner and Pilot Michael Solondz, who's with us in the gallery in the front row today. Mr. Solondz is a rare example of a pilot who did everything right. In 2018, after the death of his father, he began experiencing severe anxiety. Rather than continue flying as a commercial airline pilot, he recognized the distractions and the difficulties the anxiety was causing, and he sought treatment and help. He self-grounded, reported his condition, took himself out of the air, and sought that help. Over the years, he tried a variety of antidepressants under the guidance of his personal doctors and the FAA's doctors, Dr. Leavitt and Dennison, two FAA HIMSS-certified doctors, a psychiatrist and a forensic psychologist, and ultimately found that Rimron, the brand name of maritzapan, was the antidepressant most effective for his particular genome and gave him the least side effects, the least negative effects, and, frankly, cured and resolved his depression. After that, after more than a year of self-grounding, after multiple evaluations, including by the FAA doctors, which he was required to pay for himself, and it doesn't create a doctor-patient confidentiality, these are the FAA's experts, they gave him a clean bill of health, and both Dr. Dennison and Leavitt agreed and recommended that he could continue pursuing FLY to be ungrounded, so he sought that. He approached the FAA and asked for his medical clearance back. Well, the FAA, proving no good deed, doing the right thing, doesn't go unpunished, said no. They have said no for four years, and only after this appeal was filed in April did the FAA finally issue what they characterized as the air surgeon denial, finally explaining it's because you're on remeron, period. They don't use the word blacklist, but they say it's unapproved, it's disapproved, and as they've been saying for four years, if you want a chance at flying again, get off remeron. The advice and diagnoses and treatment and clinical records you've produced over four years be damned. None of that matters because you're on remeron. Now, the air surgeon in its denial has explained why that is. Is it because Mr. Salon has some sedative or a sleepiness, a drowsiness, a somnolence side effect? No, it is because the air surgeon has said, well, certain general studies show that some patients taking remeron have that side effect, and they cited to one general study with 54% of patients exhibiting that side effect. Yet in the very next line of the denial, the air surgeon notes, oh, but by the way, on the high dosage, the dosage Mr. Salon is on, only 14% of patients report that compared to 10% placebo. I know we were talking a lot about statistics in the last argument, and here I don't think the court needs to delve into them as completely, except to say that rather than look at Mr. Salon's pertinent medical records and the conclusions of the FAA's own certified and directed to trained physicians, the FAA has simply said, sorry, that's it. Get off the one medication that works for you or you'll never fly again. I appreciate all of those arguments and certainly the situation and the delay, but I think the starting point is that this is a special issuance license, and the FAA is essentially saying a 54% risk is too high, and we are going to approve some other drugs that work in different ways with much lower risks, but just as a sort of baseline starting position, 54% is too high of a risk. And so what is our basis to disagree with that? Well, your Honor, your basis is the regulation itself. It requires the FAA in 67.401C to provide professional consideration of all available information regarding the person, the pilot. They have to examine Mr. Salon's medical records. And moreover, your point about 54% is too high. Well, there's two things to that. The one, as I had just mentioned, on the dosage that Mr. Salon's is on, the FAA has already acknowledged only 14% compared to 10% placebo. So already they've undercut their own argument. But more to the point, the FAA, the other SSRIs, antidepressant drugs, the FFA has approved. And again, when I say approved, let's think of this as the difference between a green list, something like Tylenol that doesn't raise any flags, a gray list such as the other antidepressants, Lexapro, Zoloft, things like that, which are eligible still for a special issuance where the FAA has said it's okay that you're on those. You can't get a general certificate because of their sedative effects, the potential in the general population. But we will look at you individually, examine your medical records, and institute an entire yearlong SSRI protocol, a protocol Mr. Salon's has been through multiple times in the past and performed by Dr. Dennison. And again, the FAA, him, his doctor. So that's where the arbitrary and capricious part comes in. The FAA has created this extra blacklist, unpublished, without any rulemaking, without any comment that says certain pilots on certain medications are prohibited, period. They will not be treated the same as their fellow pilots who get individualized treatment. That, I think, is the crux of your argument is you're arguing that he did not get individualized consideration. That's correct. But I take the FAA to be saying, well, he did. He applied under the special issuance provision. And I take it that's the only provision that's at issue before us. That's correct. And they looked at his records, and they decided, no, and now you're making what I understand to be sort of a procedural claim that they didn't actually do an individualized special issuance review. They made a categorical determination based on the characteristics of Rembrandt. Am I right that that is your position? Yes, it is. And in that regard, this case is exceptionally close to the Irwin case that this court decided just two years ago. In Irwin, and it's brief fully in our brief, but in Irwin, a pilot who had a special issuance that prohibited the use of alcohol inadvertently ate some pulled chicken that had been cooked in alcohol and failed a test the next day. Eventually, this court overturned the FAA when the FAA insisted that, sorry, one failed test, regardless of all of the evidence submitted, including forensic toxicologists and everything else, a mountain of evidence Irwin submitted about his individual case and proving with no evidence to the contrary by the FAA. But the FAA held the line and said, sorry, nope, we have a bright line. We're not going to look at your individual evidence. We're just going to say, sorry, special issuance, you're done. That's exactly what we have here, where it's not about whether or not Mr. Salons is safe to fly on Rimron, because the mountain of evidence, four years of medical evidence, shows he is, that he has no sedative effects. He is not one of the ones who suffers from it. There's sort of a medical question embedded in this, which I'm not sure anyone addresses, which is, does the history assume he does have great evidence that over a period of time he has not suffered this side effect? Does that mean he's unlikely to in the future, that the risk has gone to zero? Or does it mean on a drug that generally has, if we assume the number is 54 percent, there's still some meaningful risk that the side effect starts? I didn't see anyone address that. Right. And, Your Honor, that's because there is a little bit of a medical part of that. First, I want to correct, 54 percent is not accurate because the FAA is on study to show the dosage he's on, it's only 14 percent. And so that's already a big difference. But with respect to, this isn't something like Benadryl. The studies that are in the record talk about this. It's not something where the semolence or the drowsiness is unpredictable. Indeed, the Trucker study about commercial truck drivers that the FAA cites in its denial, saying there was sort of an increased risk, talks specifically about this and comes to the conclusion, taking a single large dose at night before bed essentially alleviates any of the negative, the sedative side effects. But they're not found anymore. That's the recommendation of this study. And I believe the recommendation page with that conclusion is on page 671 of the record. Again, this is the study that the air surgeon cited in its denial as a reason why Rimron is apparently a blacklist, as compared to the other SSRI antidepressants, which also have sedative effects, anywhere between 30 and 45 percent in the general population, which, you know, okay, it's less than 54 percent, but that still means 70 or even 65 pilots out of 100 could be having, you know, a risk, according to the FAA's logic. And yet they still- The conditionally approved SSRIs have side effect rates of 30 to 35 percent? Correct. Where is that? Those are in the studies that are attached at the end of the record, the FAA studies that it brought in. The point being, the FAA has used hyperbolic language in its briefing and in the air surgeon's denial to say there's a significantly more risk. Well, you know, I'm not sure that that's a very significant difference risk, but more to the point, it doesn't give the individualized assessment that the regulation calls for. And the FAA has produced no rational basis and no reasoned explanation as to why it is treating Rimron differently and why, under the same special issuance regulation, the FAA can pick and choose which antidepressants a pilot is allowed to or is entitled to and given an individualized assessment of their own medical history to determine if that risk ever manifests, as opposed to Mr. Solange, who has been denied the individual review, which would show that with more than four years of use, the cog screenings done multiple times by the FAA doctors show no risk, no difference between the general pilot population. And really, that gets to the crux of it, because I recognize 54% may sound like more than half the general population, but that also means you're grounding 46 out of 100 pilots for no good reason? Well, let me ask you, counsel. I just want to be clear. When I read the record, and maybe I misunderstood it, I don't see a basis for your saying that the FAA never considered your client on an individual basis. All right, it goes on and on and on about your client's circumstances. And it acknowledges that your client has had these other medical evaluations and opinions. But then it says, consistent with its statutory obligation, that it has classified this particular drug in a certain way. And it's simply not going to move off that, because of its concern about what it says, and we're not physicians, are the inherent qualities of the medication, and that there are all kinds of other things that aren't like this. And your client's position, as I understand it, is that what the FAA failed to do, and let me be clear that I understand the position, is that the surgeon didn't critique each of the evaluations that your client proffered or produced for the record. In other words, I don't see the record in this case as substantiating a granting of the petition on the grounds that the agency failed to consider the issues before it, and failed to consider the evidence that was presented relevant to those issues. But rather, along the lines of Judge Garcia's question, consistent with its obligation about medical safety, air safety, it's simply not going to approve this drug. And you'd say, there was no rulemaking, there was no nothing. But at least now we have a statement by the FAA as to its position. And we may not agree with it, in the sense that your client is saying he disagrees with it. But what does the court say? In other words, it's not the typical arbitrary and capricious situation. It is, they looked at some studies and the surgeon says, here's where I come out. Yes, Your Honor. So I can understand that is certainly the position the FAA is trying to advance. However, this court does have a reasoned way of approaching the case. And in Irwin. Tell me what that is precisely. So precisely. So in Irwin, in this court, only two years ago, it explained that the court's role is to determine whether the FAA has examined the relevant data, articulated a satisfactory explanation that does not fail to consider important aspects of the problem. That's what my question went to. That's the standard. Yes, Your Honor. On these FAAs. That's correct. And Your Honor. Right. And in Irwin, the FAA did the same thing it's doing here now, where it said, sorry, we have a bright line rule. It doesn't matter. Any evidence you put will give lip service that you submitted it. Because in Irwin, the FAA did include a sentence saying, we note you submitted medical evidence to the contrary, but it did not analyze it. It did not give any explanation. It merely said, we have a rule that any failed alcohol test means your special insurance is canceled and you're forever ineligible, period. Counsel, that's the problem here. You may still have a compelling argument, but Irwin is very different. Right. Irwin was, you have a positive alcohol test, yet specific evidence showing that it wasn't because you drank anything that you shouldn't have. And this case is all about maybe the FAA should have said more, but they would, it would be totally consistent to say we are going to have a categorical rule against Remeron because we're not going to take the time when the risk is so high. They would say, and to do case by case evaluations, we will for other drugs, SSRIs, which have been around longer and we understand how they work. And we've decided to approve them in a cautious case by case way. We just haven't gotten there yet with this tetracycline type of drug. That's not, in other words, you could justify a categorical rule. And the very nature of that categorical rule would be, we don't, it could justify not looking at your individual evidence, right? They had administrability reasons and better science than you think they have. Well, Your Honor, I would say that could be the case, but that's not the case here. The FAA did not develop any of that in the record. It certainly didn't even make an administratability argument. FAA has produced no reason to justify a blanket ban on Remeron and a refusal to conduct the individualized assessment that the regulation requires on pilots on Remeron, other than to say, using hyperbolic language, that there's a significantly greater risk. Well, this next sentence, same paragraph, but next sentence, noting that actually the risk on the dosage that Mr. Solanz is on, the higher dosage, gets down to only being a 4% difference between the placebo group. And again, I can't stress this enough. The FAA has not adduced or even claimed any evidence that this risk is something that's sort of intermittent, that drowsiness comes and goes. The opposite is true. The FAA has developed its SSRI protocol to do a longitudinal study of each airman on an antidepressant. The protocol is discussed at length in our brief, and that's what Dr. Denison based his evaluations on. He followed that same SSRI protocol. Did you develop the argument and the facts that, for example, you were saying this is a 54% rate, but in fact we have a study showing 14% and also providing them information about the drugs they have approved that shows it's 30 to 35% in order to really tee up this kind of arbitrary decision making? Is that in the record? I'll say yes and no, Your Honor. The other drugs that were very recently approved were approved during this process and within the last year. So, no, we did not include those studies. The FAA, though, provided a few of those studies for the record and insisted on including them. What about SSRIs since 2010? Yes, those are in the record. They're in the record. They've been attached to the many letters, the many requests and the applications and the requests for reconsideration. They're discussed at length. For example, Dr. Denison's 2022 report at the end of 2022, when he finished the second year of an SSRI protocol, or the second one-year instance of going through the entire SSRI protocol, Dr. Denison even explained, I've looked at and reviewed the specific studies that have been presented, and these are the same studies that the FAA is now citing in its denial, in particular about the long-haul effect on truckers, and which comes to the conclusion, do a single high dosage at night and you don't have the sedative problem. Which, again, Dr. Denison saying, hey, this is what Mr. Solanz is doing, and there's not a sedative problem, and it hasn't been a sedative problem observed for the four clinical years now that we've been doing it. And really, your honors, this gets to the heart of the issue of what a special issuance is even about, and why this is an abuse under the APA and arbitrary, capricious, and contrary to law. The FAA has created a situation, and its argument that Rimron is just blacklisted, period, that's fine with respect to a general aviation medical certificate. There can be qualifications, and if Rimron is one of the prohibited medications, then the pilot does not qualify for the general certificate. That's fine, but that's why the FAA created a separate regulatory scheme and administration for special issuance, because that is the opportunity for pilots to demonstrate that they do not suffer under a medical condition that prevents them from getting the general, but also prevents them from doing the piloting, from being safe, from being effective. And that's why the FAA created its SSRI protocol for antidepressants. The FAA has determined that if you pass that protocol, and you're on these seven slightly older antidepressants, then you've passed. You're eligible for a special issuance, because that necessarily shows that it's in the public interest, and there's not a public safety concern. Well, Mr. Solans has done that same protocol repeatedly for years, but because the FAA has, without any rulemaking, without any comment, and without any actual explanation or acknowledgement that this drug has ever been blacklisted until this appeal, has said, sorry, that's just not enough. That's just period. We have a bright line rule. And again, Your Honor, Judge Garcia, I know you think Irwin has some differences, but it does get to the point that when administering the FAA special issuance program, it can choose what evidence it looks at. It needs to look at the individualized medical evidence to assess whether that individualized medical evidence overcomes this presumption of some safety issue. And here we know it does, because we have four years of studies, not doctor shopping, but from the FAA, him, psychiatrists, and neuropsychologists. We agreed on this argument. There's still the FAA's sort of like a conditional denial based on these other diagnoses. We can't approve you now until you provide us with more information. One question, just, is it true that you've not provided that additional information because you don't think it should be necessary? Has he provided the initial? Your Honor, I would say that additional information had been provided many times to the FAA, but because we've been on a four year hamster wheel, where we submit something and then six months to nine months later, we get a response. Some of it may be outdated. So, as part of a new special issuance and additional eye exam, that's fine. But I will say the other medical issues that the FAA cites and the air surgeon cites, they're clearly protectual. The AFib issue, atrial fibrillation, was resolved. The special issuance is in the record that was issued 20 years ago when that issue arose. Since then, it had been resolved and Airmen Salons had, you know, proven the atrial fibrillation issue was resolved and had gotten regular, you know, the 100% general certificates for years. And yet, it's dredged up now just to throw more mud on the wall and distract from the issue that the blacklist is RIMRON. When you go to the… You're referring to the blacklist of RIMRON. Is it not permissible for the FAA to have general disqualifications based on certain medications for a period of time unless and until it determines that they don't ordinarily pose a risk? Or is it your position that something that precludes a non-special issuance license must nonetheless be scrutinized by the FAA in terms of the individual pilot's experience on that medication? If there just isn't a role for a categorical hard stop, people on this medication aren't going to get special issuances. Or is your argument not that broad? Well, Your Honor, I'd say it's more towards the latter, but it doesn't have to be that broad. And certainly, this court need not issue an opinion that broad. The court here can focus on the fact that the FAA has approved several antidepressants and put in place a specific protocol because all of those antidepressants in the general population have an incidence of significant side effects that could affect aviation safety. That's why the FAA created its SSRI protocol. Here, the FAA has said, sorry, we're going to single out a different antidepressant, not tell pilots that it's singled out until after they've applied and gone through it, ignore whether or not that other antidepressant has actual, like manifests the side effects we're concerned about, and instead just treat it differently. In the individual's case? As a categorical rule. As they've said, it manifests as a categorical rule, and there are some qualifiers on that with lower doses, taking it at night. You haven't mentioned the after two weeks on it, but there are various things in the record that say there may be people who take this who wouldn't suffer these effects. My question is more a legal one, whether your position is inconsistent with a kind of general no-go on a medication, even if there may be individuals who would still be unaffected by the reasons for that no-go decision. Well, to that, Your Honor, I would say the special issuance regulation that the FAA created requires an individualized assessment. So, if a pilot does not qualify for the general certificate due to the use of some medication that the FAA has not green listed, then the pilot's alternative is either give up their career or pursue a special issuance. And again, the point of the special issuance is not to say we're exempting or ignoring some particular safety hazard. It's to say, is there a reasonable way to minimize, mitigate, and even eliminate the risk that prevented a general certificate? I understand that, but isn't Judge Pillard's question, don't you have to answer her question directly? Pardon me, Your Honor? I don't understand that to be an answer to Judge Pillard's question, and that's what we're searching for here in terms of what your position is. You have repeated that an individualized assessment is required, and you define it one way, and the FAA has defined it to allow a blacklist. Yes, Your Honor, I would say in the Irwin case two years ago, this court found that having a categorical rule and applying a categorical basis for denial to a request for special issuance was arbitrary, capricious, and contrary to the administrative procedures. There's no point in our trying to re-argue that case. We're trying to understand what the legal principles there mean in light of the statutory and regulatory scheme before us. I thought you have to answer Judge Pillard's question, because your answer is, as I understand it, that the FAA could not interpret a special issuance to include blacklisted drugs, period. That it can't rely on that kind of categorical determination, that it has to scrutinize the basis for its own categorical no-go determination, and to test whether it would apply to each individual seeking it. And it's not only that, but as I understand it, it's that it has to do its own study of the particular drug, decide what it thinks, and whether any evidence presented to it persuades it to the contrary, and then do its own examination of your client, even though the FAA says very clearly that whether you are prescribed a certain drug is a decision for the airman's or airperson's personal physician, not the FAA. Well, Your Honor, respectfully, I'm not quite sure that I would characterize our argument as that. I don't believe the FAA has to conduct its own medical studies. I think that's outside the scope of their expertise, and we're certainly not advocating this court create some sort of rule like that. But if the FAA finds that a drug, in its opinion, in light of the evidence before it, should be blacklisted, it cannot do that under your view of what the special issuance requires. That's what we're trying to understand of your position. So our position is that a blacklist is impermissible to the extent the FAA is using it as basically a rubber stamp no, and refusing to look at any contrary medical evidence, and in particular medical evidence of safety, individualized medical evidence of safety that the airman presents with respect to their application for the special issuance. Suppose the FAA and the surgeon wrote a pilot, a letter that said, we have examined all of the studies going back 20 years, and the particular drug that's being used by this particular pilot has a 10% risk associated with it. And it lists the risks, including sleep apnea, constipation, nausea. It just goes down the list. In your view, as a matter of law, would our decision in urban require granting a petition? So let's be clear. The petition is not asking this court to do something it's clearly uncomfortable with, and that would be substituting its own judgment as to whether this airman is safe. The petition is asking the court to order the FAA to actually consider the individualized medical evidence submitted. So, Your Honor, to your hypothetical, I think the issue is that the FAA can look at any studies it wants and create any blacklist it wants for a general certification. But the FAA chose to create in its regulations an alternative process, the special issuance process, which requires individualized assessment of the airman's particular safety and records. It's up to the airman to produce those records, to go through any of the required examinations, to submit the required information. Here, Mr. Solans has done all of that. So that really is the issue for this court. Can the FAA essentially merge its general certification requirements with the special issuance certification requirements so that the blacklist for a general medical certificate overrides and envelops, really devours, the special issuance process? And the answer has to be no, not just because the FAA wrote its regulations to create two separate divergent processes, but also for important public concerns, including public safety. Your Honors, early in the brief, we opened with some extensive quotes from bipartisan, the Aviation Authority and the Transportation Committee of Congress. And those are in the record. The FAA had it to consider. Because Congress has noted that there's a mental health crisis with pilots, that pilots, because of the FAA's secret blacklists, are afraid and are not seeking treatment, are instead self-mitigating or foregoing treatment altogether. They're afraid because the FAA is not doing its special issuance procedures and not following them, and instead is taking the same rubber no denial stamp that it used for the general medical certificate and applying it to the special issuance without actually looking at the airman's individualized medical records. And keep in mind, these are individualized medical processes that the FAA is asking the airman and sending back a denial letter saying, if you want a special consideration, go get these extra exams that show that this medical condition is not a concern. The airmen are doing that, including extensively Mr. Solange for four years at their own expense, at their own time, while their own careers are interrupted. They're ultimately the FAA trained, licensed, it's a very small pool of doctors and psychologists that the FAA allows to do these examinations in the HIMSS program. Those same FAA experts are saying it is not a problem that this particular pilot, it does not suffer any of the deleterious side effects that the FAA was concerned about. But the FAA still continues to say, sorry, we stamped your general request denied because of our blacklist, so now we're going to use that same blacklist to deny all special issuance despite inviting the pilot to continue the process and support medical information to the contrary. That, your honors, is what's arbitrary, capricious, and contrary to law, and that's what your honors have an opportunity to correct, to order the FAA to actually follow its special issuance process to look at Mr. Solange's uncontroverted longitudinal medical records and determine whether that sedative effect is present or not. If your honors have no further questions. We'll hear from the agency. Mr. Carver, good morning. Good morning. May it please the court, Ray Carver for the FAA. The Federal Air Surgeon has the responsibility to ensure that pilots, and especially commercial pilots such as petitioner, are able to perform their duties without endangering public safety. In this case, the Federal Air Surgeon made a reasoned determination based on the available medical and scientific information and clearly communicated those reasons, the reasons for denial to the petitioner. It's undisputed the petitioner is not medically qualified under the applicable medical standards, so instead he challenges the FAA's exercise of its discretion in denying a request for an exemption from those medical standards. Of course, we acknowledge that the review of an agency's exercise of discretion. I mean, there's tendencies on both sides in the briefing, but Mr. Solange says he's not seeking an exemption. He's seeking an individualized determination that he meets the standards, which is, I think, appreciably different. If an airman would want to prompt the FAA, I mean, in a lot of circumstances you could petition for a rulemaking. Is there a way for someone to effectively petition for a rulemaking that the FAA would reconsider its categorical disqualification of people taking Rembrandt? So I don't know that there's a specific way to prompt a rulemaking, but I would say in this case the FAA continues to review these policies. And as you can see from the Federal Air Surgeon's letter, she notes that there were several drugs that were approved in the last year that were added to the list. And also you can see from the Federal Air Surgeon's decision that she actually reviewed the new article that he had submitted with his application. She reviewed it, she weighed the evidence, and came away with a conclusion regarding the impact of that article on her decision. Where are you pointing to? On page JA-12 of the record, it is the CASPER article that was provided by Petitioner's Counsel. And the Federal Air Surgeon specifically states that she reviewed that article. And note that while, as the Petitioner recognized, the FDA's information says that there's over half the people that take this medication experience somnolence or sedation, the Federal Air Surgeon does note that this CASPER article does say that there are some studies that say that some people experience it or some studies see it at possibly a 14 percent. But she goes on to review that article and noted that that article simply provides theories. And as we stated in our brief, the CASPER article highlights this as a paradox in the data and then goes on to speculate what this could possibly be and what the impact may be. This is far from conclusive evidence of a lesser risk. So are you saying we should read this? His argument has a lot of intuitive appeal. The FDA has this really high rate, but it's based on generic doses. This is specific to the type of dose I'm taking. And this study, which is based on old studies, shows just a 14 percent rate. Are you saying we should read this as that the air surgeon has determined that that study's report of 14.8 percent is unreliable? Or just that they didn't come up with a great explanation of why that's happening? But that sure seems to be the rate when you use that dose. So I would say that that article does not overcome the risk that's posed by the FDA's information. The FDA's 54 percent. They acknowledge the 54 percent. That 14 percent, they acknowledge or this article states that that's been seen in several studies. However, it can't even explain where the reason for that reduction is. This is a simple point. The FDA, as it comes to us, it just has a number, 54 percent. And he's saying here's another number. And it's the number that's at the dosage that I take. We don't have any other information on the face of this other than it sure seems like the 14 percent is the more relevant number than 54. So that's where we rely on the Federal Air Surgeon's review of these records to determine the impact of them. So in your view, the Federal Air Surgeon would be empowered to, even though she didn't do it here, to say someone on Remeron, given enough medical records on that person, enough relevant medical tests conducted, that the air surgeon could, under a special insurance review, find the person qualified? Yes. If the Federal Air Surgeon determined by looking at the available evidence that the risks associated with Remeron could be mitigated by something like the SSRI program, then certainly she could issue a special insurance medical certificate. So it doesn't have to be moved to the conditional review or the conditional approval category that the SSRIs have been moved to in order, or these other, I guess, I don't know, bupropion or duloxetine and venlafaxine. I don't know what category those are in. So even with the Remeron in the category that it's in now, that doesn't preclude special insurance? Is that what you're saying? You're not moving it into a different category? Correct. If there were additional information that were to come out to show that the risk is much less than what has been seen before, or that it could be mitigated sufficiently through the SSRI program, the monitoring, whatever conditions might be placed on it, then certainly the Federal Air Surgeon could rethink her stance on Remeron. That would be a categorical question.  That's a general question. What I'm asking, and sorry if I haven't been clear, what I'm asking is, are there drugs that are, practically speaking, a blacklist? You're not going to, you're basically, special issuance or general issuance. If somebody's on certain drugs, you're going to think that's just, that's too dangerous. And therefore, even within the context of special issuance, the air surgeon can say, no, I'm sorry. I see that. And I'm not really going to look at your experience on that drug just because we haven't gotten there with that. We're not yet comfortable with individual treating, you know, clinical opinion about your flight worthiness on that particular drug. Is there such a category or not? So I believe that the Federal Air Surgeon can make that determination. I don't, I disagree with Petitioner's assertion that there's a blacklist on medications. Well, it's a freighted term, but I guess I'm trying to come up with it. I'm calling it no-go, that there might be certain medications where it's like, that medication and flying a commercial airplane, we're not going to get into the details in anyone's case because we just don't think we can do that. Is that a meaningful analytic category as a practical matter that the FAA uses or are you? So certainly we see that with Remeron here, where she, the Federal Air Surgeon has reviewed this, and for years has been clear that the use of Remeron is not acceptable in terms of aviation safety due to the risk posed. But if she had, and this is a separate question, and this is really a legal kind of policy schematic question, not a question about his record. If somebody came, you know, presented their records and their doctor said, yeah, this person's on Remeron, but he was very drowsy for the first two weeks, consistent with some of the studies, including the study the FAA relies on, but zero problems with sleep, perhaps the person has never needed much sleep, blah, blah, blah, a high level of alertness, in fact, extraordinary at the charts level of alertness and whatever else is in the record. If the air surgeon thought, yeah, I'm not going to change my general view on Remeron, but this person seems good to go. Could she, without reassessing Remeron in general, grant a special issuance license? Yes, there's nothing preventing the Federal Air Surgeon from issuing a certificate or a special issuance in those terms. So if there are, if there is information available that, like I said, would mitigate that risk, then the Federal Air Surgeon would be able to grant a special issuance. And that's why I push back a little bit against the blacklist, because this isn't a published, you know, this isn't a rulemaking of, you know, these certain medications are on a list and they're always a no-go. This is a decision that the Federal Air Surgeon makes by reviewing the available information. And in this case, 54 percent, over half of people on this medication experienced... But in, Justin, maybe think about it this way. In terms of characterizing what position the air surgeon took in this order, am I right that the position is, based on the available evidence, I am going to maintain my categorical rule against allowing the use of Remeron? I believe that is, I believe that is the conclusion. To make exceptional whatever other thing, just as it, as we stand. I'm staring at the list that is published on the FAA's website that says, conditionally acceptable medications and has many listed. And then under a bright red box, unacceptable medications. And so this is the position that the air surgeon is taking. Let me, I just want to, yes, this is how I'm thinking about the case, right? There's been some confusion over whether the argument is that the FAA can just never have a categorical rule about a drug. Let's just put that to the side. The question at a minimum has to be, has the FAA adequately explained why it has a categorical rule for this drug? And on that, I would love to hear your best arguments that the FAA gave a sufficient explanation. Because when I read this, it says, basically, there's a high risk. It acknowledges this 14.8% number. And then it just asserts the one rationale is the approved drugs have, quote, much lower rates of. Doesn't say how much lower doesn't say. Any of the sorts of things I might have expected it to say, why is it? Why is this enough of an explanation of the categorical rule? So, your Honor, first, I go back to the standard of review here. The Supreme Court stated in State Farm that the court must uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned. In this case, you clearly have a path here where the federal air surgeon reviews the FDA prescribing information. It says that over half of those people experience somnolence. And then it acknowledges the petitioner's article. It says, okay, well, in some cases, this may be lower, but it doesn't provide a solid conclusion. It provides theories. The FAA itself relied on this study, and that study found that the set of effect is much alleviated by taking it at night as Mr. Solanas does. And also, I believe it said that the set of effects are really present during the first two weeks. And Mr. Solanas has been, I mean, he had to wait, whatever, six months. He's been on this drug for a very long time, and his doctors are saying no set of effects. So, if the air surgeon were persuaded by that, it's your position she could have, notwithstanding the red box, she could have granted for him, but that it was also within her prerogative, given the red box to say no. Yes, I believe that is true. If the federal air surgeon had reviewed that information and believed that the risk could be mitigated, it was within the federal air surgeon's ability to grant a special issuance there. However, on the flip side, the federal air surgeon also has the ability to look at certain medications and certain medical conditions, for that matter, and say that there are certain risks that are just simply too great for a pilot, especially a commercial pilot, to be flying in aviation. Her primary responsibility is to that of aviation. Okay, so let me follow up on that point. And this is on page 20 and 21, which is, what is it, JA 12 and 13. So, the surgeon says she's looked at this paper, all right, and that's the reference to the 14%. And the only reference I'm aware to the 14% is in this 1997 study by Casper, right? And she critiques it as theoretical, basically, and speculative. Then she says, I also note that a 1998 study by Ramakers, O'Hanlon, et cetera, assessing the performance while driving and using this drug at a dose of 30 milligrams daily. This study reported poor performance with keeping lane position, all right? So, she goes on and she says, given the available evidence and my duty to ensure, I'm unable. But then she goes on to point out these recent changes that were made. But she goes on as to this particular case to have paragraphs about this particular pilot's other medical conditions. And you'll find that at JA 13 in both the paragraph starting second and the paragraph starting third. And then she has a conclusion about sleep apnea and other sleep conditions. So, what I want to be clear about in terms of the adequacy of her explanation, it talks about this Remeron drug, what the evidence was before her, what studies she had and how she interpreted them. And then talks specifically about physical medical conditions of this particular pilot. Petitioner's counsel has objected to the surgeon's reference to those other medical conditions. And I'm not clear other than earlier a statement in terms of saying, well, you never mentioned this before. But now you're mentioning these conditions now. Why this court should not consider that as part of the surgeon's complete explanation, dealing with the historical view of the drug, the study that the pilot offered this Casper paper, and then looked at a study done a year later. And then talked about the particular physical medical conditions of this pilot. What I'm trying to understand from petitioner's argument is why it would be improper to consider the pilot's individual physical conditions, since he wants this individualized and says the surgeon must do it. And that's why I question him as this hypothetical, because I think it's close to saying that there must be a new evaluation by the surgeon of this particular drug. And he doesn't say she has to do the study, but she's looked at what he's given her, she's looked at what they had, and she's looked at him professionally. So, if his view is that nevertheless, under Irwin, that is inadequate, other than filing a lawsuit, is that the only remedy a pilot like the pilot before us has? Because your answer was, well, there's no way to file a petition for a rulemaking. So, the remedy in that situation, again, to provide whatever additional information, additional studies that they would like to provide in that reconsideration process. And if the federal air surgeon determines that that doesn't mitigate the risk, they would be able to challenge it as they have. But again, the federal air surgeon is uniquely competent, is within the unique competence of the federal air surgeon to make these kind of determinations. She has to evaluate the scientific studies, the possible symptoms that could come. Okay, counsel, I'm going to interrupt because I just want to be clear about this. The FAA, are you taking the position that an individual pilot in seeking this special issuance would have to himself or herself fund a study to show that since these studies in the past century, a lot has happened, and these studies, I mean, those are very expensive. And who has the incentive to spend that money on this type of study? You go to Congress and ask Congress for a special appropriation? I mean, counsel says all these congressmen are upset about this blacklisting, but do they give the FAA the funding to do these studies? So, I'm certainly, I don't mean to insinuate that we would ask him to go out and fund some study, but the FAA has to rely on the studies that are completed in the community. And we look at the FDA's information, the studies that they rely on. And I don't think we're in any position to question that, but the studies that the FAA itself relies on. My question, however, counsel, as you appreciate, was trying to understand this whole process here. Because we're raising a lot of questions that may be beyond what the court can decide. But to understand what's happening to an individual pilot who, as counsel said, has done everything right. So, exactly. The studies that the FAA itself relies on, like the Ramaker study says much less somnolence if the medication is taken at night. The Wingen study that the FAA itself relies on says the drowsiness is mitigated after the first two weeks of taking it. And so, the question, and as you've noted, well, there's a six-month waiting period for someone who's gone on a new medication. And I guess the question that I understand Mr. Stallings to be asking is why, given that the air surgeon has the authority to decide that the risks, even of remeron, don't disqualify me. How could my record possibly be more the poster child for the person who is entitled to that treatment, to that special issuance? And I don't think he's saying you must give it to me, but he's saying I don't see your explanation that's responsive to my particular case. So, the federal air surgeon goes at length through his record and acknowledges on page 10 that his conditions are stable on treatment with normal performance and testing. But then she, on page 12, when she starts to talk about the medication, she states that that doesn't overcome the risks that are involved in that medication. And certainly, Petitioner disagrees with the judgment that was made at the end of the day, but it's the federal air surgeon's judgment based on the FDA information and those particular studies. Like the federal air surgeon said, I mean, certainly, the Ramaker article does talk about some reduced risk, but it also states in there that there was a poor performance on driving on day 16. And so, it's those things that, you know, that is the federal air surgeon's particular area of expertise is to review the methodology and the reasoning behind all of these articles. And she clearly did. She clearly read these articles. She evaluated them and put weight on them. And as the court required in State Farm, she made a rational connection between the facts that she found and the conclusions that were made. And, you know, Petitioner, he states that he's, you know, making this more of a procedural, we want to make sure there's a review. But he's clearly wanting to replace, wanting to substitute his judgment. He's asking that this court. To be fair, I mean, Judge Rogers was pointing to this additional paragraph, discussion of optic neuritis, which the treating doctors have said is resolved, is normal. The malignant melanoma, just completely wrong. And the air surgeon says, your doctor said that the diagnosis is melanoma in situ, not malignant melanoma. And then goes on to say malignant melanoma can pose a high risk. Completely irrelevant because that's not his diagnosis. And then sleep apnea under the compliant treatment that's mentioned. So there's a feeling not unwarranted in reading this that it is hard to discern a reasonable path. What really the decision is based on. So those, the final three there, the optic neuritis, the malignant melanoma, and the sleep apnea are based on the federal air surgeon's determination that she needed additional information. So that's the decision there. I mean, specifically with the malignant melanoma, she acknowledges that there's some conflict in the record. The record also states that he has malignant melanoma. And so when she asks for additional records, she's asking in part for all pathology specimens reported. So she's looking for the background, the complete medical file for that malignant melanoma so she can look at it and determine, okay, was this melanoma in situ? Was it malignant melanoma? Which was the correct diagnosis? And the same for optic neuritis. She states in there about the risk of it developing or of it worsening and, I believe, developing into MS. So she's asking for continued evaluations, continued review by his doctor. And so these are ongoing reports that we would normally ask for. And so if, and I think she makes it clear, if he were to not be taking remeron, these are the things that the FAA would need in the future. And I think that's the Federal Air Surgeon's attempt to try to give a holistic review and to be very open and honest and say, look, if you stop taking remeron, we're still going to need some other things. And so she's trying to be open and honest about what the FAA's concerns are and what might be needed in the future, notwithstanding the remeron. Can I ask just one last question about, so I certainly appreciate the argument that basically she looks at the studies and concludes remeron poses too high risk of aviation safety. That's not the kind of thing that we have the position or role to question on its face. He then has an addendum to that. You have approved other drugs, conditionally, with significant rates of somnolence. And it looks like the whole sum and substance of what could be a response to that argument is the sentence that says, those have a much lower risk of somnolence. And why shouldn't we at a minimum be remanded to understand how much lower? Why is that significant? Why can you have case by case for those drugs, but not for this drug? Can you give sort of a direct response to that? Why is that sentence enough? Is there other material here? Yeah, so I don't think the FAA, I don't think the federal air surgeon was required to go point by point every single detail. You know, the court said that, you know, an essay is not required for the disposition of every application. And in here, the federal air surgeon drafted a seven-page letter to try to address each one of his conditions, address the articles that he provided, and tried to give weight to each one of those. And specifically, she stated that they have a lower risk of somnolence. So I don't think that she's required to provide each and every detail about the level of risk or somnolence in one medication versus somnolence in the other. This isn't, the requirement is not that she prove every single point and respond to each one of the arguments. The standard of review here is to determine whether she has connected, she's made a connection between those facts and the decisions made. And I think clearly here, she has done that. She's, petitioner may disagree with the conclusion that she's reached, but the federal air surgeon has clearly communicated the connection between those facts. So am I right in reading, I'm not sure how to read it, that the reference, sleep apnea is referenced at the end of the letter, but it wasn't a basis for the denial here? I would, my reading of it was that sleep apnea would require the ongoing information that's requested. So sleep apnea, the program does require that they provide ongoing data regarding their CPAP. It's provided here, but it's not the basis here because the remeron is the basis. I believe the primary basis would be remeron. And so, too, with the malignant melanoma, not the basis of this denial, but just saying, if we were to go forward, if we were to clear the remeron hurdle, that we'd need the pathology reports and other information. Correct. The federal surgeon saying, look, remeron, we cannot issue you a special issuance, but also I can't make a decision at this point regarding these other conditions because we just don't have the information. And the optic neuritis being resolved, nonetheless, this denial letter says a quarter and a half of people with it end up with MS within 15 years. It doesn't seem like 15 years would matter if someone's just two years away from mandatory retirement. Well, if it's retirement from the airlines, they would still be able to fly commercially, just not for an airline. And, of course, they'd be able to fly privately as well in the airspace. They would also still be able to fly privately as well, which is still a concern. All right. Thank you. I think we have. You have 90 or 90. He has the honors. Thank you. All right. So just a couple of points I want to address that were really raised for one. There's a lot of talk about what exactly is the burden on the airman and what must they prove in particular with respect to studies and such. But I want to make 100% clear that the issue here in this case, if you can be summarized as succinctly as possible, is that with respect to remeron, the federal air surgeon is relying wholly on generic studies and is not relying on the individual medical evidence from the airman, despite the air surgeon relying on individual medical evidence for all other antidepressants. And in particular, we see this in the air surgeon's denial on page 12 of the joint appendix. One of the last sentences about remeron says, this paper, referring to the Casper article and study, does not refute the possibility of mirazapine still causing sedating effects. That's a telling admission because in the next paragraph, the air surgeon explains, well, the other antidepressants that we have a separate procedure for also have sedating effects. This is the arbitrary and capriciousness manifest. Now, with respect to other medical conditions, I want to be clear. I think our briefs do a pretty good job of explaining why those are pretextual. In particular, though, it seems to bolster the remeron, sort of hide from it. In particular, with the CPAP. Arbitrary and capricious, inadequate. Excuse me? So you really, I mean, pretextual is usually a pretext for some kind of bias as opposed to just arbitrary, inadequate. Right, well, I would say the sort of bias is towards protecting the unpublished blacklist of medications and the ability of the air surgeon. I don't think it's a, it's, there's nothing that precludes the FAA from having a red box on certain. Well, I'll say. At least you haven't pointed to anything. Yes, well, I will point to that. The FAA's attorney explained that with respect to having a sort of a bright line, a box that the air surgeon has within their discretion under the regulations. And indeed, the special issuance regulation calls for the individualized assessment despite a, to use your honor's words, a red box of something. So the failure to do that individualized assessment and instead just to rely on the red box with the special issuance would be the arbitrary and capricious. But what I really wanted to get to with respect to the CPAP issue is just one example. Since that just came up as this potential, well, it would still be denied because other information needs to be presented. Your honors, you've seen the copious record, the years of applications submitting this medical information and then not getting a denial for so long that then the next round of the denial said, well, hey, get off Remeron. And if you do, we'll reconsider you. But by the way, resubmit everything you already submitted. I'll say with the CPAP, that's particularly telling because the CPAP condition, and I believe we have the site in our brief to the FAA's guidance on it. That's a standard condition of a special issuance. These aren't preconceptions. The only precondition is the airman's willingness to abide by the CPAP rules and recording requirements if the special issuance is given. Because that is the entire point of a special issuance, to craft something less than a general medical certificate that puts specific requirements on the airman. And sometimes for a pilot with night blindness, that airman might not be allowed to fly at night. For a pilot that has perhaps some physical disability and is unable to operate controls in a certain way, there's special issuances that are given that require a cockpit adaptation to allow operation of those controls. The point is the FAA has tremendous experience and capability to craft a special issuance that addresses the particular medical concerns that preclude a general certificate. And that's all we're asking for here, is that the FAA take its time, actually do its consideration. And frankly, with these other conditions, the FAA proved, the air surgeon proved, she's capable of looking at particular medical evidence. We think her cherry pick sites are wrong and explained in our brief, but proved capable of looking at the specific pilot. Whereas with Rimron here, there's no look at the specific pilot at all. And that's what this court explained is wrong in Irwin, where it said the FAA is a repeat offender and must, well, Your Honor. Oh, may I finish the quote? Wrap up. Oh, yes. Well, that was the last one. And that's the standard that this court explained in Irwin, that because the FAA is a repeat offender, they, quote, cannot simply declare its expertise and instead must exercise expertise and demonstrate sufficiently that it has done so. That's not what's happened here. Thank you, Your Honors. The case is submitted.
judges: Pillard; Garcia; Rogers